NOT FOR PUBLICATION

## UNITED STATES DISTRICT COURT
## DISTRICT OF NEW JERSEY

| | |
|---|---|
| ABL TITLE INSURANCE AGENCY, LLC, <br><br> Plaintiff, <br><br> v. <br><br> MAXUM INDEMNITY COMPANY, <br><br> Defendant. | Civil Action No.: 15-7534 (CCC) <br><br><br> **OPINION** |

**CECCHI, District Judge.**

I.      __INTRODUCTION__

This matter comes before the Court on Plaintiff ABL Title Insurance Agency, LLC's ("Plaintiff" or "ABL") and Defendant Maxum Indemnity Company's ("Defendant" or "Maxum") cross-motions for summary judgment. ECF Nos. 54, 55.  The parties opposed the cross-motions for summary judgment (ECF Nos. 56–58), and replied in support of their motions (ECF Nos. 59, 60).   The Court held oral argument in this matter. ECF No. 67.  Having considered the parties' submissions (ECF Nos. 54–60, 62, 64–71) and presentations at oral argument, the Court will **GRANT** Defendant's motion for summary judgment (ECF No. 54) and **DENY** Plaintiff's motion for summary judgment (ECF No. 55).

## II.   **BACKGROUND**[1]

Plaintiff ABL is a licensed title agency that provides title insurance and closing services for residential and commercial real estate transactions. Pl. SMF ¶ 1.  In 2015, when ABL was acting as a closing agent for a home sale, one of its employees fell victim to an email scam.  An unauthorized person posed as the seller of the home, issued fraudulent transfer instructions, and induced an ABL employee to wire them money.  ABL sought coverage for losses stemming from this incident from its insurer, Defendant Maxum.  Maxum has denied coverage because ABL's professional liability policy has a specific exclusion for acts of conversion.

### A.   **Factual Background**

Maxum issued ABL a professional liability insurance policy, Policy Number PFP-6019265-04, which covered a period of May 19, 2015, to May 19, 2016 (the "Policy"). Id. ¶¶ 3–4.[2]  The Policy provided limits of $1 million per claim and in aggregate. Id. ¶ 5.  ABL paid the Policy's $6,500 premium. Id. ¶ 6.  The Policy provides that Maxum would pay "those sums that an 'insured' becomes legally obligated to pay as 'damages' because of a 'wrongful act' in the rendering of or failure to render 'professional services' by any 'insured' or by any person for whose 'wrongful acts' an 'insured' is legally responsible for." Id. ¶ 7.  The Policy contains an addendum with exclusions, which provides, *inter alia*, that the Policy does not apply to "any 'claim' or 'suit' arising out of or resulting from . . . [a]ny damages arising out of the . . . conversion [or] misappropriation . . . of funds or other property." Id. ¶ 15.

---

[1] Background facts are taken from the parties' statements of material fact, pursuant to Local Civil Rule 56.1.  *See* ECF Nos. 54-2 ("Def. SMF"), 55-6 ("Pl. SMF"), 57-1, 58-2, 59-1, and 60-2.  To the extent that certain facts have been admitted by both parties, the Court will cite only to "Def. SMF" or "Pl. SMF" and the corresponding paragraph number.

[2] Maxum's representative testified that he did not recall whether Maxum and ABL negotiated any of the terms of the Policy, and he further testified that it would not be typical for Maxum to negotiate such terms prior to issuing the Policy. ECF No. 60-1 at 5.

As part of its business as a title agency, ABL maintains an escrow account through which its customers' closing funds pass in connection with real estate closings. Id. ¶ 2.  On June 26, 2015, ABL acted as the closing agent for the sale of a residential property located in New Jersey. Id. ¶¶ 16–17.  At the closing, the sellers received a $579,360.48 check from ABL's escrow account. Id. ¶ 17.  Later that day, an unknown third party (the "Scammers") sent an email, purportedly from the seller's attorney to the buyer's attorney, requesting payment by wire instead of by check. Id. ¶ 18.  The Scammers used an email address that closely resembled the address the seller's attorney used, however, the email address was in fact different. Id. ¶ 18.  In reply, the buyer's attorney requested wiring instructions. Id. ¶ 19.  After receiving wiring instructions, the buyer's attorney forwarded the Scammers' email to ABL. Id. ¶ 20.

On June 29, 2015, the Scammers sent another email requesting payment, which was eventually received by an ABL employee. Def. SMF ¶ 11.  In response, the ABL employee wired $579,360.48 to an account in the name of "Nat Jay Music & Ent LLC" (hereinafter, "Nat Jay Music"). Id. ¶ 12.  By wiring the money in this way, the employee acted against the direction of ABL's title insurer, Westcor Land Title Insurance Company ("Westcor"), which advised agents to wire funds only to the record title holder and to confirm wiring instructions using a communication medium other than the medium by which such instructions were received. Pl. SMF ¶¶ 22–23.  As a result of the wire transfer to presumably the Scammers, ABL was unable to issue checks related to other matters and had insufficient funds to cover some checks it had already issued. Id. ¶ 27.  Thereafter, ABL became legally obligated to pay claims made by the parties whose checks had bounced or whose payments could not otherwise be made because ABL had insufficient funds in its escrow account to cover the disbursements. Id. ¶ 28.

On July 21, 2015, ABL discovered it was the victim of the Scammers' email scheme. Id. ¶ 31.  The following day, ABL notified its insurance broker and law enforcement that it had fallen victim to the scheme, and notified Maxum that it would make a claim under the Policy in connection with the incident. Id.; *see* Def. SMF ¶ 16.  On August 12, 2015, ABL supplemented its notice to Maxum, claiming that it would be liable for aggregate claims against it in the amount of $574,022.48 as a result of the scam. Pl. SMF ¶ 34.  ABL explained that it would be liable for $339,354.20 for unpaid escrow items plus $234,668.28 in checks that had "'bounced' because ABL had insufficient funds in its . . . account to cover disbursements from multiple real estate closings." Id. ¶ 35; ECF No. 55-1 at 8–9.  By September 3, 2015, Maxum had not made any determination about ABL's claim. Pl. SMF ¶ 39.  On September 8, 2015, ABL's counsel informed Maxum that, absent a response to the claim by September 11, 2015, ABL would consider its claim to have been denied. Id.  Maxum did not respond before September 11, 2015. Id. ¶ 40.

On July 27, 2015, ABL's title insurer Westcor sued Nat Jay Music and various unnamed individuals (the Scammers) in the Superior Court of New Jersey for, *inter alia*, conversion and fraud. Def. SMF ¶ 26; ECF No. 54-14.  Westcor's complaint alleges that at some point before or after the closing on June 26, 2015, the Scammers hacked the seller's attorney's email to divert monies from the transaction for their personal benefit. ECF No. 54-14 at 3, ¶¶ 19–20.  Westcor's complaint further alleges that, based on the fraudulent email, ABL wired funds to the hacker's bank account. Id. at 4, ¶ 27.  Ultimately, Westcor prevailed and recovered approximately $302,000 of the stolen funds, with some of the distributions made to ABL. Def. SMF ¶ 31; ECF No. 54-15.

B.     **Procedural History**

On September 25, 2015, ABL filed this action seeking declaratory relief and damages for breach of contract in the Superior Court of New Jersey, Law Division. ECF No. 1-1.[3]  On October 15, 2015, Maxum removed the case to federal court pursuant to 28 U.S.C. § 1441.  Discovery has concluded (ECF No. 40) and Maxum now moves for summary judgment (ECF No. 54).  ABL opposes (ECF No. 57), and has filed its own motion for summary judgment (ECF No. 55), which Maxum in turn opposes (ECF Nos. 56, 58).  Both parties have filed replies (ECF Nos. 59, 60).  The Court held oral argument in this matter.[4]

III.   **LEGAL STANDARD**

A.     **Summary Judgment**

Summary judgment is appropriate if the "depositions, documents, electronically stored information, affidavits or declarations, stipulations . . . , admissions, interrogatory answers, or other materials," demonstrate that there is no genuine issue as to any material fact, and, construing all facts and inferences in a light most favorable to the non-moving party, "the moving party is entitled to a judgment as a matter of law." *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986); *see also Pollock v. Am. Tel. & Tel. Long Lines*, 794 F.2d 860, 864 (3d Cir. 1986).

---

[3] Because Maxum removed this action to federal court, ABL's claim under N.J.S.A. § 2A: 16-51 *et seq.* has been converted to a claim under the federal Declaratory Judgment Act, 28 U.S.C. § 2201 *et seq. See BCB Bancorp, Inc.* v. *Progressive Cas. Ins. Co.*, No. 13-1261, 2013 WL 8559731, *4 (D.N.J. Oct. 8, 2013) ("Plaintiffs' claims under the New Jersey Uniform Declaratory Judgment Act have been converted to claims under the federal Declaratory Judgment Act.").

[4] Subsequent to the filing of the motions for summary judgment, Maxum filed five notices of supplemental authority in support of its motion for summary judgment (ECF Nos. 62, 64, 65, 68, 71), and ABL filed two notices of supplemental authority in support of its motion for summary judgment (ECF No. 66, 69), to which Maxum replied (ECF No. 70).  The Court has duly considered all submissions.

The moving party has the initial burden of proving the absence of any genuine issue of material fact. *See Celotex*, 477 U.S. at 323. Once the moving party meets this burden, the non-moving party has the burden of identifying specific facts to show that, to the contrary, a genuine issue of material fact exists for trial. *See Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 585–87 (1986). In order to meet its burden, the non-moving party must "go beyond the pleadings and by [its] own affidavits, or by the 'depositions, answers to interrogatories, and admissions on file,' designate 'specific facts showing that there is a genuine issue for trial.'" *Celotex*, 477 U.S. at 324 (citation omitted); *see also Big Apple BMW, Inc. v. BMW of N. Am., Inc.*, 974 F.2d 1358, 1363 (3d Cir. 1992) ("To raise a genuine issue of material fact," the opponent must "exceed[] the 'mere scintilla' threshold . . . ."). An issue is "genuine" if it is supported by evidence, such that a reasonable jury could return a verdict in the non-moving party's favor. *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). A fact is "material" if, under the governing substantive law, a dispute about the fact might affect the outcome of the suit. *See id.* "In considering a motion for summary judgment, a district court may not make credibility determinations or engage in any weighing of the evidence; instead, the non-moving party's evidence 'is to be believed and all justifiable inferences are to be drawn in his favor.'" *Marino v. Indus. Crating Co.*, 358 F.3d 241, 247 (3d Cir. 2004) (quoting *Anderson*, 477 U.S. at 255).

The legal standard for summary judgment does not change when both parties file motions for summary judgment. *Bacon v. Avis Budget Group, Inc.* 357 F. Supp. 3d 401, 413 (D.N.J. 2018) (internal quotations and citations omitted). According to the principles outlined above, in reviewing each motion, "the court construes facts and draws conclusions in favor of the [non-moving party]." *Id.* (internal quotations and citations omitted).

B.      **Interpretation of Insurance Policies**

Both parties agree that New Jersey law is applicable here. *See* ECF No. 54-1 at 3, ECF No.

57 at 2.[5]  "Under New Jersey law, the interpretation of an insurance contract on undisputed facts

is a question for the court to decide as a matter of law and can be the basis for summary judgment."

*Wimberly Allison Tong & Goo, Inc. v. Travelers Prop. Cas. Co. of Am.*, 559 F. Supp. 2d 504, 510

(D.N.J. 2008); *see Ackerman v. Westport Ins. Corp.*, No. 06-4142, 2008 WL 4205749, at *4

(D.N.J. Sept. 8, 2008).  Further, under New Jersey law, "[a]n insurance policy is a contract that

will be enforced as written when its terms are clear in order that the expectations of the parties will

be fulfilled." *Flomerfelt v. Cardiello*, 202 N.J. 432, 441 (2010).  Policy language is interpreted

"according to its plain and ordinary meaning." *Id.* (citation and internal quotation marks omitted).

Terms that are not clear, but ambiguous, are construed in favor of the insured and against the

insurer. *Id.*  But "[i]f the language is clear, that is the end of the inquiry." *Chubb Custom Ins. Co.*

*v. Prudential Ins. Co. of Am.*, 195 N.J. 231, 238 (2008).  "[I]n the absence of an ambiguity, a court

should not 'engage in a strained construction to support the imposition of liability' or write a better

policy for the insured than the one purchased." *Id.* (citation omitted); *see also Flomerfelt*, 202 N.J.

at 441.  "If the terms of the contract are susceptible to at least two reasonable alternative

interpretations, an ambiguity exists," and in that event, "a court may look to extrinsic evidence as

an aid to interpretation." *Chubb*, 195 N.J. at 238.

Generally, policy exclusions are narrowly construed, and it is the insurer's burden to "bring

the case within the exclusion." *Flomerfelt*, 202 N.J. at 442 (citation and internal quotation marks

---

[5]  Indeed, the Policy was issued by Maxum and delivered to ABL in New Jersey. ECF No. 7-3 at 4.  Moreover, ABL is licensed as a title agency that operates in New Jersey (ECF No. 55-6 at 1) and both of Plaintiff's two members, Robert A. Cosentino and Simeon A. Bogiages, are domiciled in New Jersey (ECF No. 55-6 at 1).

omitted).  "[I]f there is more than one possible interpretation of the language, courts apply the meaning that supports coverage rather than the one that limits it." *Id.*  However, "far-fetched interpretation[s]" do not create ambiguity, and "courts must be careful not to disregard the 'clear import and intent' of a policy's exclusion." *Id.*  "Rather, courts must evaluate whether, utilizing a 'fair interpretation' of the language, it is ambiguous." *Id.*

## IV.  <u>DISCUSSION</u>

The parties here do not dispute the key facts.  The primary question before the Court on these cross-motions is whether either party is entitled to judgment as a matter of law based on an interpretation of the relevant Policy provisions. *See Wimberly Allison*, 559 F. Supp. 2d at 510.  For the reasons set forth below, the Court finds that judgment as a matter of law is warranted in Defendant's favor.  The Court recognizes that the facts and legal arguments presented in the cross-motions overlap, but nevertheless analyzes both motions independently, and construes facts and draws conclusions in favor of the non-moving party.

The main coverage provision of the Policy at issue here states:  "[Maxum] will pay those sums that an 'insured' becomes legally obligated to pay as 'damages' because of a 'wrongful act' in the rendering of or failure to render 'professional services' by any 'insured' or by any person for whose 'wrongful acts' an 'insured' is legally responsible for." ECF No. 7-3 at 11.  "Wrongful act" is defined in the Policy as "any actual or alleged negligent act, error or omission in the rendering or failure to render 'professional services.'" *Id.* at 19.  "Professional services" means "only those services of a professional nature specified in the Declarations in the conduct of your business, including clerical functions associated with such services, by you or by a person for whose acts or omissions any 'insured' is legally responsible." Id.  The Declarations define ABL's "business description and professional services" as "Title Agency." Id. at 8.

In addition, the Policy provides for various exclusions, but the parties focus on one – an exclusion for acts of conversion.  An addendum to the Policy provides the "Conversion Exclusion" at issue here:  "This insurance does not apply to nor shall we have the duty to defend or indemnify any 'claim' or 'suit' arising out of or from: . . . 3. **Any damages arising out of the commingling, conversion, misappropriation or defalcation of funds or other property.** ECF No. 7-3 at 24 (emphasis added).[6]  Although the Policy does not define "conversion,"  New Jersey law defines it as "an unauthorized assumption and exercise of the right of ownership over goods or personal chattels belonging to another, to the alteration of their condition or the exclusion of an owner's rights." *Chicago Title Ins. Co. v. Ellis*, 978 A.2d 281, 287 (N.J. Super. Ct. App. Div. 2009) (citations omitted).  Furthermore, the New Jersey Supreme Court has defined the phrase "arising out of" broadly, to mean "originating from, growing out of or having a substantial nexus." *Flomerfelt*, 202 N.J. at 454 (citation and internal quotation marks omitted); *see Am. Motorists Ins. Co. v. L-C-A Sales Co.*, 155 N.J. 29, 35–36 (1998); *Prudential Prop. & Cas. Ins. Co. v. Brenner*, 795 A.2d 286, 289 (N.J. Sup. Ct. App. Div. 2002) ("Whether used in a provision defining coverage or in an exclusion, the phrase ["arising out of"] is defined broadly.").

Maxum contends, and the Court agrees, that the Conversion Exclusion directly addresses the factual scenario here.  ABL testified that when it wired funds on June 29, 2015, the third-party recipients (presumably, the Scammers) were not entitled to the funds and did not have any rights to the funds. Dep. of Plaintiff, ECF No. 54-4 at 24:4–11, 27:22–25.  Indeed, Westcor (ABL's title insurer) sued the Scammers for, *inter alia*, conversion. Def. SMF ¶ 26; ECF No. 54-14.  Thus,

---

[6] The Court notes that ABL is not seeking indemnity for a claim made by the Estate of Gladys Chersack against ABL for a breach of fiduciary duty because that claim was settled in the Westcor litigation. ECF No. 57 at 27.  Defendant acknowledges this concession. ECF No. 59 at 14. Accordingly, the "Fiduciary Duty Exclusion" is no longer in dispute. *See* id.

even according to Plaintiff, the Scammers engaged in an act of conversion under New Jersey law when they defrauded ABL. *See Chicago Title Ins. Co.*, 978 A.2d at 287.[7]  As a result of the Scammers' conversion, ABL was unable to issue checks related to its professional matters and had insufficient funds to cover checks it had already issued (causing checks to bounce). ECF No. 55-6 ¶ 27.  Therefore, the claims for which ABL seeks coverage—claims made by the parties whose checks from ABL had bounced or whose payments could not be made because ABL had insufficient funds in its escrow account to cover the disbursements (PSMF ¶ 29)—originate from, grow out of, and have a substantial nexus to, the Scammers' conversion.  Thus, the plain and ordinary meaning of the Exclusion Provision requires that coverage be denied.

In opposition, ABL argues that the Conversion Exclusion is ambiguous because it may be interpreted as applying only to the actions of ABL employees and thus does not exclude losses resulting from conversions performed by third parties, such as the Scammers. ECF No. 55-1 at 15–19.  The Court does not find this argument to be persuasive.  "A genuine ambiguity arises only where the phrasing of the policy is so confusing that the average policyholder cannot make out the boundaries of coverage." *Passaic Valley Sewerage Com'rs v. St. Paul Fire & Marine Ins. Co.*, 206 N.J. 596, 608 (2011) (quoting *Progressive Cas. Ins. Co. v. Hurley*, 166 N.J. 260, 274 (2001)).  Here, the Exclusion Provision begins by stating that "**[a]ny** claims arising out of . . . conversion" are excluded, and there is no limiting language. ECF No. 7-3 at 24 (emphasis added).  The average policyholder would understand that the lack of qualifiers or carve-outs, along with the broad lead-in language, denotes that all acts of conversion are excluded from coverage, even if the conversion was committed by a third party.  There is no genuine ambiguity here.

---

[7] ABL does not appear to dispute that an act of conversion occurred, but argues instead that the Conversion Exclusion applies only where an act of conversion is committed by ABL or its employees. *See* ECF No. 55-1 at 15–19.  That argument is addressed further below.

When the Conversion Exclusion is read in the context of the Policy as a whole, it becomes even clearer that the Exclusion includes acts of conversion committed by both the insured and by third parties. *See Frangella v. Frangella*, No. A-6112-11T4, 2013 WL 4792863, at *5 (N.J. Super. Ct. App. Div. Sept. 10, 2013) ("In interpreting a contract, the court must also consider it as whole, and avoid interpreting one provision in isolation from others pertaining to the same subject.") (citation omitted).  Other exclusions in the Policy are distinctly worded and include limiting language, which signals that the excluded conduct is confined to acts by the insured.  For example, the sixth exclusion in the addendum—listed just a few lines down from the Conversion Exclusion—precludes coverage for "[a]ny damages arising out of the breach of the underwriting authority **by any insured** . . . ." ECF No. 7-3 at 24 (emphasis added).  Likewise, Exclusion 2(L) in the Policy precludes coverage for "[a]ny 'claim' based upon or arising out of or resulting from discrimination **by any 'insured'** on the basis of age, color, race, sex, creed, national origin, marital status, sexual orientation, handicap status, disability or any other protected category under applicable law . . . ." Id. at 13 (emphasis added).  By contrast, the Conversion Exclusion lacks carve-outs, which would otherwise limit its application to a particular party (*i.e.*, the insured).  This distinction in the language makes it evident that the Conversion Exclusion applies to conduct regardless of the parties involved, whereas the other cited exclusion provisions are confined to conduct performed by the insured, Plaintiff.

Federal courts in this circuit grappling with similar, broadly worded exclusions have also found them unambiguous, and enforced such exclusions regardless of who committed the excluded conduct.  For example, in *Authentic Title Services, Inc. v. Greenwich Insurance Company*, the plaintiff title insurer was also a victim of computer fraud/conversion. No. 18-4131, 2020 WL 6739880, at *1 (D.N.J. Nov. 17, 2020).  There, the plaintiff title insurer was denied coverage for

resultant damages because its insurance policy similarly excluded coverage for claims "based on or arising out of" the theft, stealing, conversion, or misappropriation of funds. *Id.* at *1–5. The court therein found that the exclusion was unambiguous and clearly applied to conduct by third parties because it included the broad phrase "arising out of" and lacked limiting language (whereas other exclusion provisions expressly referred to conduct by the insured). *Id.* at *5–7. Similarly, here, the court finds that the broadly worded Conversion Exclusion applies to all claims arising out of conversion, regardless of who engaged in the act of conversion. *See Authentic Title Servs.*, 2020 WL 6739880, at *5–7; *U.S. Specialty Ins. Co. v. Sussex Airport, Inc.*, No. 14-5494, 2016 WL 2624912, at *4 (D.N.J. May 9, 2016) (finding that an exclusion of insurance coverage for bodily injury claims "arising out of" certain conduct (parachuting), without any limiting language, unambiguously applied to any bodily injury claims arising out of parachuting activity, regardless of the party involved); *see also Countryway Ins. Co. v. Slaugenhoup*, 360 F. App'x 348, 350–51 (3d Cir. 2010) (finding that an exclusion provision regarding "the use of a motorized vehicle," with no limiting language, was unambiguous and "meant to exclude all coverage for liability imposed by law as the result of motor vehicle use–*by anyone*") (emphasis added).

Moreover, there are no factual circumstances here warranting a finding that the Policy's language is ambiguous. The case Plaintiff cites in support of ambiguity, *Flomerfelt*, is distinguishable. The facts in that case "demonstrate[d] the complexity of interpreting the exclusion when a claim for personal injury asserts multiple possible causes and theories for recovery against the insured." *Flomerfelt*, 997 A.2d at 1003. There, ambiguity arose because the plaintiff had asserted several possible causes for her injury, but the record was inconclusive as to whether her injury originated from or had a substantial nexus to an excluded act. *Id.* at 1003–06; *see N. Plainfield Bd. of Educ. v. Zurich Am. Ins. Co.*, No. 05-4398, 2011 WL 1044239, at *3 (D.N.J. Mar.

17, 2011), *aff'd*, 467 F. App'x 156 (3d Cir. 2012); *Liberty Ins. Corp. v. Tinplate Purchasing Corp.*, 743 F. Supp. 2d 406, 415 (D.N.J. 2010) (finding that *Flomerfelt* "only found the phrase 'arising out of' to be ambiguous within the very specific factual circumstances of that case . . . The record was inconclusive as to the cause of the plaintiff's injuries; she may have been injured by alcohol or drugs or both, either before, during or after the party (as there was a delay in summoning aid).") (describing *Flomerfelt*, 202 N.J. at 456). Here, by contrast, the record definitively indicates that ABL's losses grew out of, originated from, and had a substantial nexus to an excluded act (conversion). Plaintiff's losses are part of a chain of events that began with the Scammers' conversion of funds through an email scheme. *See supra* at 3–4. Moreover, the act of conversion was the final and definitive cause of Plaintiff's inability to issue checks related to its professional matters and its insufficient funds to cover checks already issued.[8]

As stated above, if the language of the Policy is clear, "that is the end of the inquiry." *Chubb*, 195 N.J. at 238. Because the Court has found that the Policy's language is unambiguous, Plaintiff's arguments regarding the doctrine of the insured's reasonable expectations, including arguments related to the Policy's "Innocent Insured" provision (ECF No. 55-1 at 23), are unavailing. *See Oxford Realty Group Cedar v. Travelers Excess & Surplus Lines Co.*, 229 N.J. 196, 208 (2017) (explaining that the reasonable expectations doctrine applies when

---

[8] Plaintiff also attempts to analogize the instant case to *Search EDP, Inc. v. Am. Home Assur. Co.*, 267 N.J. Super. 537 (App. Div. 1993), wherein the plaintiff employment agency was sued for professional negligence after it had performed a negligent background screening of a violent individual it ultimately referred for employment, who later assaulted a co-worker. *Id.* at 540. The court therein provided coverage for resultant injuries, despite a policy exclusion for bodily injury claims, because the originating cause was a covered event (negligent background screening). *Id.* at 544–46. By contrast, here, the originating cause was an excluded event (conversion through an email scheme). Moreover, the lead-in language of the errors and omissions policy's exclusion provision in *Search EDP* ("for") is distinct from the broad lead-in language here ("arising out of"). *See id.* at 542.

language is ambiguous, or terms and conditions are misleading); *see also Authentic Title Servs.*, 2020 WL 6739880, at *5–7 (rejecting insured's arguments about the reasonable expectation doctrine because the insurance policy's language was unambiguous).

Moreover, although it appears that specific fraud/crime policies provide coverage for losses arising from fraudulent transfers and computer fraud, ABL purchased no such policy for the relevant period here. *See, e.g.*, *Morgan Stanley Dean Witter & Co. v. Chubb Grp. of Ins. Companies*, No. A-4124-03T2, 2005 WL 3242234, at *4 (N.J. Super. Ct. App. Div. Dec. 2, 2005) (involving computer crime policy, which provided "coverage unambiguously to situations where an unauthorized person poses as a customer or other authorized person to issue the fraudulent transfer instructions"). In fact, Defense counsel argued that "[ABL] did not purchase a computer crime policy or a fraudulent transfer policy[,] which do insure losses arising out of these fake email schemes . . . They purchased a different policy. They purchased a professional liability policy[,] which only covers errors or omissions in providing professional services. These policies across the board do not insure theft. There's no coverage for conversion." Oral Argument Transcript 6:2–17. In response, Plaintiff's counsel acknowledged that "[t]he policy at issue here is a professional E&O [Errors and Omissions] Policy. It's not some other policy, it's not those other policies that [Defense counsel] was mentioning." Id. at 14:17–19.

Accordingly, Defendant has met its burden of showing that the instant case is within the bounds of the Conversion Exclusion, and summary judgment is warranted in its favor. Looking separately at Plaintiff's motion for summary judgment, the Court finds that, because the claims at issue fall within the bounds of the Conversion Exclusion, there is no basis for judgment in Plaintiff's favor. Therefore, Plaintiff's motion for summary judgment is denied.

## V.    <u>**CONCLUSION**</u>

For the reasons stated above, the Court **GRANTS** Defendant's motion for summary judgment (ECF No. 54) and **DENIES** Plaintiff's motion for summary judgment (ECF No. 55).  An appropriate Order accompanies this Opinion.


**DATE**: March 31, 2022                                    *s/ Claire C. Cecchi*

                                                                    **CLAIRE C. CECCHI, U.S.D.J.**